UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

JILL E. DILLON                                                                                        PLAINTIFF

VS.                                                         CIVIL ACTION NO. 3:12cv333-DPJ-FKB

MISSISSIPPI DEPARTMENT
OF CORRECTIONS                                                                             DEFENDANT

ORDER

This employment-discrimination case is before the Court on Defendant Mississippi Department of Corrections' Motion for Summary Judgment [27].  Plaintiff has responded in opposition [30].  The Court, having considered the parties' submissions and the applicable law, finds that Defendant's motion should be granted in part and denied in part.

I.      Facts and Procedural History

Plaintiff Jill Dillon began working for MDOC in 2006 as a probation officer for the Lincoln-County probation office.  On June 8, 2010, Dillon approached her supervisor, Neill Jones, and requested that he transfer her to the open probation-officer position in Walthall County.  Only one officer at a time was assigned to work in the Walthall County office, but that position included an official vehicle with fuel and the office was substantially closer to Dillon's home.  Jones declined to transfer Dillon to that office and more or less told her "that a girl shouldn't be down in Walthall County because they would be alone in that office."  Dillon Dep. [27-1] at 23.  Jones did, however, inquire whether Dillon's husband, Todd Dillon, was interested in the position.

The following week, Dillon filed a grievance with MDOC alleging sex discrimination. Dillon first met with Christy Gutherz, MDOC's Community Corrections Director, who criticized

Dillon's attendance record but stated that Dillon would be considered for the position and that sex was not a factor. Unsatisfied, Dillon pressed her claim and next met with both Deputy Director Lora Cole and Gutherz. Cole informed Dillon that the "position in Walthall County will likely be filled by a Field Officer other than you, who has a longer tenure with the agency and the needed ISP [house arrest] caseload supervision experience which you do not have." Def.'s Mot. [27-2] Ex. 1 to Ex. B, Grievance Docs. at 5. Also during this meeting, Gutherz announced that she was ordering Pam Webber, the Pike-County Supervisor, to audit all of Dillon's case load to identify any deficiencies and improve performance. Finally, Dillon brought her claim to Commissioner Christopher Epps, who affirmed Cole's decision and noted that someone had already been selected for the Walthall County office. Epps also clarified that Jones lacked the authority to transfer probation officers. MDOC eventually accepted Jones's recommendation and transferred Robbie Roberts to the Walthall County position.

Roberts's transfer opened-up a vacancy in the Pike-County office, and Dillon renewed an earlier request to be transferred there in the event her Walthall County request was denied. Epps granted that transfer, and on August 2, 2010, Dillon began working in that office under Pam Webber's immediate supervision.

Webber confronted Dillon about her work on several occasions. Among those encounters, Webber instructed Dillon to seek preapproval before discharging probationers and required her to submit new and unfamiliar "Movement Sheets" to Webber on a monthly basis. Webber also confronted Dillon about a suspicious drug-test result and supposedly accused her of falsifying the document, which, she warned, was a terminable offense. Dillon, who was having trouble correctly completing her Movement Sheets, refused to submit one for November and

Webber reprimanded Dillon for insubordination. Dillon tendered her resignation to MDOC on November 29, 2010.

Dillon filed a charge with the EEOC on October 27, 2010, alleging sex discrimination and retaliation. In its July 11, 2011 determination, the EEOC found reasonable cause to believe sex motivated the transfer denial and that MDOC retaliated against Dillon for complaining about discrimination. After receiving the March 14, 2012 right-to-sue letter, Dillon timely filed her Complaint on May 11, 2012. In it, Dillon alleges that MDOC discriminated against her on the basis of sex, retaliated against her for complaining about it, and constructively discharged her.[1] MDOC has moved for summary judgment on all of Dillon's claims. The motion is fully briefed and the Court is prepared to rule.

II.     Standard

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The

---

[1] Dillon also seeks injunctive and declaratory relief. Though the parties do not address this issue, the Court questions whether Dillon has standing to pursue it. The parties are instructed to confer on this issue when drafting a proposed Pretrial Order.

nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (citation omitted). Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993). In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075. When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted).

III.     Analysis

    A.     Discrimination Claim

Dillon alleges that MDOC discriminated against her on the basis of sex when it denied her transfer request to the one-person, Walthall County office. Title VII prohibits discriminatory employment actions on the basis of sex or gender. "A plaintiff can prove a claim of intentional discrimination by either direct or circumstantial evidence." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000). Although the parties principally argue under the *McDonnell Douglas* burden-shifting framework, the Court finds that direct evidence of discrimination exists.

"Direct evidence is evidence which, if believed, proves the fact without inference or presumption." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005) (citation omitted). In the Fifth Circuit, "to qualify as direct evidence of discrimination, an employer's comment 'must be direct and unambiguous.'" *Read v. BT Alex Brown Inc.*, 72 F. App'x 112,

4

119 (5th Cir. 2003) (citation omitted).  Direct evidence of discrimination includes "any statement or document which shows on its face that an improper criterion served as a basis . . . for the adverse employment action." *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003) (citation omitted).  "To qualify as direct evidence, a comment must be directly related to sex-based animus; proximate in time to the termination; made by an individual with authority over the employment decision; and related to the employment decision." *Krystek v. Univ. of S. Miss.*, 164 F.3d 251, 256 (5th Cir. 1999).  If the plaintiff provides direct evidence of discrimination, the burden shifts to the employer to "prove by a preponderance of the evidence that the same decision would have been made regardless of the discriminatory animus." *Jones*, 427 F.3d at 992.

It is undisputed that Dillon's supervisor, Jones, informed Dillon that he would not transfer her to a one-person office because she was a "girl."  MDOC asserts, however, that Jones's statement is not direct evidence of discrimination because Epps, not Jones, held the authority to transfer.  Epps Dep. at 16; Def.'s Mot. [27] Ex. 1 to Ex. B, Grievance Docs. at 6 (stating Jones lacks authority to transfer employees).  MDOC's interpretation of the test is too narrow.  In *Arismendez v. Nightingale Home Health Care, Inc.*, a manager made discriminatory remarks while terminating the plaintiff's employment, but the defendant employer contended that the manager lacked "authority over" the decision.  493 F.3d 602, 607 (5th Cir. 2007).  The Fifth Circuit Court of Appeals disagreed, noting that it "looks to who actually made the decision or caused the decision to be made, not simply to who officially made the decision.  Thus, if the evidence indicates that the worker possessed leverage, or exerted influence, over the titular

decisionmaker, the worker's discriminatory animus may be attributed to the employer." *Id.* at 608 (citation and quotation omitted).

Whether Jones exerted such influence is at least a question of fact. *See* Epps Dep. at 17 (noting Jones could recommend employees for transfer); Jones Dep. at 12 (similar); *see also* Todd Dillon Aff. ¶¶ 3–4 (stating Jones informed him he was pre-approved to transfer to Walthall County). And in any event, Epps apparently shared Jones's view that Dillon's sex disqualified her from the position she sought. According to Epps, his personal preference and MDOC practice—if not policy—is to "always put a male in a one-person office." Epps Dep. at 10; *see also id.* at 13 ("How is [house arrest] done, in this particular office, it's going to be a male officer. It's a male officer there today and there was a male officer placed in there when the—when Mrs. Dillon tried to go there."). Because Dillon has presented direct evidence, MDOC is not entitled to summary judgment unless it is able to rebut this presumption. *Jones*, 427 F.3d at 992.

Though MDOC has not expressly conceded that sex motivated the decision, both Jones and Epps seem to confirm that it did. MDOC therefore argues that it is permitted to restrict females from staffing one-person offices under Title VII's Bona Fide Occupation Qualification (BFOQ) exception. That exception provides:

> [I]t shall not be an unlawful employment practice for an employer to hire and employ employees . . . on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise . . . .

42 U.S.C. § 2000e-2(e)(1).[2]

"The BFOQ defense is written narrowly, and [the Supreme Court] has read it narrowly." *Int'l Union, United Auto, Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 201 (1991) (citations omitted); *see also Dothard v. Rawlinson*, 433 U.S. 321, 334 (1977). Discrimination based on sex may be permissible if that classification creates a safety issue, but "in order to qualify as a BFOQ, a job qualification must relate to the essence or to the central mission of the employer's business." *Johnson Controls*, 499 U.S. at 203 (citations and quotations omitted). Additionally, some courts have recognized that privacy concerns may justify a BFOQ. *See, e.g.*, *Everson v. Mich. Dep't of Corr.*, 391 F.3d 737, 756–58 (6th Cir. 2004) (finding privacy rights of female inmates justified exclusion of male guards); *Jones v. Hinds Gen. Hosp.*, 666 F. Supp. 933, 937 (S.D. Miss. 1987) (addressing privacy concerns between male patients and female nurses). But in any case, "[t]he burden of proving that a discriminatory qualification is a BFOQ . . . rests with the employer." *Johnson Controls*, 499 U.S. 221–22 (White, J., concurring) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 248 (1989); *Dothard*, 433 U.S. at 333).

---

[2] The parties address this case under the direct-verses-circumstantial-proof dichotomy, so the Court has followed that approach. That said, MDOC does not explain where within the analysis the Court should consider its BFOQ defense. Given the nature of that defense, the primary question appears to be whether MDOC has proven—as a matter of law—that a BFOQ exists. *See Healey v. Southwood Psychiatric Hosp.*, 78 F.3d 128, 131–32 (3d Cir. 1996) (noting district court erred in analyzing BFOQ defense at pretext stage because *McDonnell Douglas* did not apply to facial disparate treatment: "When open and explicit use of gender is employed, as is the case here, the systematic discrimination is in effect 'admitted' by the employer, and the case will turn on whether such overt disparate treatment is for some reason justified under Title VII.").

MDOC suggests first that females cannot operate one-person offices because they would be expected to drug test a predominantly male pool of probationers.  It is unclear whether this is intended to raise privacy or efficiency concerns.  But either position is inadequate because male officers currently staffing these one-person offices regularly drug test female probationers with the apparent assistance of female volunteers.  Epps Dep. at 13–14.  MDOC has not shown that the male inmate population in Walthall County is sufficiently greater that its female counterpart to warrant the difference in treatment.  Second, MDOC raises the possibility of dealing with irate offenders or working at night.  Assuming MDOC intends to elicit safety concerns, its argument does little to explain why females would be unable to perform the duties of a one-person office. *See Johnson Controls*, 499 U.S. at 202, 204 ("[D]anger to a woman herself does not justify discrimination . . . .  The safety exception is limited to instances in which sex . . . actually interferes with the employee's ability to perform the job." (eliding paragraphs)).  Given this sparse record, MDOC has failed to show that, as a matter of law, it "had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved."  *Weeks v. S. Bell Tel. & Tel. Co.*, 408 F.2d 228, 235 (5th Cir. 1969).  Questions of fact remain.  MDOC's motion for summary judgment on the discrimination claim is therefore denied.[3]

---

[3]The Court would likewise deny summary judgment even under a circumstantial-evidence analysis.  In its original memorandum, MDOC claims that Dillon has failed to state a prima facie case, but the only element it seems to attack is the requirement of showing an adverse employment action.  And on that point, the Court would find a question of fact as to whether the desired position was "objectively better" given that it was closer to Dillon's home and provided a vehicle.  *See Alvarado v. Tex. Rangers*, 492 F.3d 605, 614 (5th Cir. 2007) (citing *Burger v. Cent. Apartment Mgmt., Inc.*, 168 F.3d 875, 879 (5th Cir. 1999)).  Assuming a prima facie case, MDOC then argues that Dillon failed to rebut each and every non-discriminatory reason for the decision, but the only reason MDOC provides in any detail is its claim that being a male is a

B.     Retaliation

Dillon claims that MDOC retaliated against her in violation of Title VII by subjecting her to an audit after she complained of sex discrimination and then scrutinizing her performance after she was transferred to work under Webber in Pike County.  Because Dillon has not asserted any direct evidence of retaliation, her claims proceed under the *McDonnell Douglas* burden-shifting framework.  *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007).  First, Dillon must state a prima facie case by showing that (1) she engaged in a protected activity, (2) MDOC took an adverse employment action against her, and (3) there was a causal connection between the protected activity and the adverse action.  *Id.*  If Dillon establishes a prima facie case, the burden then shifts to MDOC to offer a legitimate, non-retaliatory reason for its actions.  *Id.*  And if MDOC meets this burden of production, Dillon must show "retaliation was the but-for cause for the employer's action."  *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 657 (5th Cir. 2012) (citing *Long v. Eastfield Coll.*, 88 F.3d 300, 308 (5th Cir. 1996)).

MDOC has not properly placed the prima facie case in issue at this stage in the litigation.  In its initial memorandum, MDOC noted the burden-shifting framework and listed the prima facie requirements, but it did not attempt to show the lack of a genuine dispute as to any of those elements.  *See* Fed. R. Civ. P. 56(a), (c).  MDOC did, however, argue in Reply that its audit of Dillon's work was not an adverse, retaliatory act under *Burlington North and Santa Fe Railway v. White*, 548 U.S. 53 (2006).  While there may be an issue on this point, it is the practice of "the

---

BFOQ.  MDOC does mention in other parts of its memorandum that Dillon lacked ISP training, but a question of fact exists as to whether it was required because the job was apparently offered to a male who also lacked this training.  Todd Dillon Aff. ¶¶ 3–4.  In sum, even if the Court followed MDOC's burden-shifting invitation, it would still find a question of fact.

district courts to refuse to consider arguments raised for the first time in reply briefs." *Gillaspy v. Dallas Indep. Sch. Dist.*, 278 F. App'x 307, 315 (5th Cir. 2008) (citation omitted). So for purposes of this motion, a prima facie case is present.

MDOC does, however, contend that Dillon failed to rebut its legitimate, non-retaliatory reason for its actions. The Court will start by reviewing the audit-related claim and conclude with the alleged increased scrutiny at Webber's hands in Pike County. MDOC claims that the audit occurred "to improve Dillon's job performance." Def.'s Mem. [28] at 9. This is consistent with Christy Gutherz's July 8, 2010 email initiating the audit. Def.'s Mot. [27] Ex. 1 to Ex. E, Gutherz Email. ("The purpose of this audit is to identify any areas that need improvement and coach and mentor her in the areas that are below par."). Gutherz later testified that the purpose "was also to determine whether or not Mrs. Dillon was performing her job." Gutherz Dep. at 27. Though there is some space between those explanations, the Court assumes without deciding that MDOC met its burden of production.

The burden therefore returns to Dillon. *See McCoy*, 492 F.3d at 557. To meet it, Dillon can show that the proffered reason is "unworthy of credence" in that it is "not the real reason for the adverse employment action." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). Dillon satisfies this burden regarding the audit.

It should first be noted that the audit was ordered during the very meeting in which Dillon aired her complaints of sex-based discrimination. And while "temporal proximity alone is insufficient to prove but for causation," *Strong v. Univ. Healthcare Sys., LLC.*, 482 F.3d 802, 808 (5th Cir. 2007), close temporal proximity can be considered in conjunction with other evidence.

*Evans v. City of Hous.*, 246 F.3d 344, 356 (5th Cir. 2001).  Here, the temporal proximity was immediate, and other evidence exists.

For example, Dillon was told during her grievance meeting that MDOC would audit *all* of her cases and her computer files.  Yet there is evidence that MDOC typically audited only 15% of an employee's work.  Dillon Dep. at 29.  Dillon testified that she had never heard of a complete audit of this nature and that she was not informed of any prior complaints that she "was doing a bad job."  *Id*.  This testimony seems consistent with Gutherz's July 8, 2010 email initiating the audit and her deposition testimony as to why it was ordered.  The email states that the purpose "is to *identify* any areas that need improvement."  Def.'s Mot. [27] Ex. 1 to Ex. E, Gutherz Email (emphasis added).  Her testimony confirmed that the purpose was "to determine whether or not Mrs. Dillon was performing her job."  Gutherz Dep. at 27.  So there is no indication why a full-blown audit of this unique nature was deemed necessary.  *See Evans*, 246 F.3d at 356 (finding that evidence was sufficient to support retaliation claim where employee was first subject to scrutiny after protected activity).[4]  Dillon also argues that the true purpose of the audit could not have been the provision of necessary training because no such training occurred.  Though MDOC says Dillon was counseled after the audit, a question of fact exists on this point.

The evidence must be reviewed in a light most favorable to the non-movant—Dillon.  And when so viewed, the circumstantial evidence along with the elements of the prima facie case are sufficient to present the matter to the jury.  The motion for summary judgment is denied as to this aspect of Dillon's retaliation claim.

---

[4]MDOC did not rebut this portion of Dillon's Response.

Finally, as to the claims of increased scrutiny after Dillon's transfer to Pike County, the Court finds that the motion should be granted. When Dillon was transferred, she came under Webber's supervision. Dillon clearly did not care for Webber's management style, but she fails to show that Webber treated her differently than others or that Dillon experienced anything other than Webber's normal practice. Additionally, with respect to the "Movement Sheets," Webber specifically instructed Dillon to complete them and only reprimanded Dillon after she refused to submit one in November 2010. Dillon has failed to establish this aspect of the retaliation claim, so it is dismissed.

### C. Constructive Discharge

MDOC also seeks summary judgment on Dillon's damages claims premised on constructive discharge. "A resignation is actionable under Title VII, allowing the plaintiff to seek compensatory damages for events after the resignation, only if the resignation qualifies as a constructive discharge." *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001).

In order to establish a claim for constructive discharge, "a plaintiff must establish that working conditions were so intolerable that a reasonable employee would feel compelled to resign.'" *Id.* (quoting *Faruki v. Parsons*, 123 F.3d 315, 319 (5th Cir. 1997)). Courts evaluate satisfaction of this standard by considering a non-exclusive list of events:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement [or continued employment on terms less favorable than the employee's former status].

*Id.* (brackets in original) (citations omitted).

Dillon attempts to boot-strap her discrimination and retaliation allegations together as the basis for her constructive discharge claim. But "[c]onstructive discharge requires a greater degree of harassment than that required by a hostile environment claim. . . . [, and d]iscrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge . . . ." *Id.* (citations omitted). The only remotely relevant aggravating factors are the interactions between Webber and Dillon. According to Dillon, Webber accused her of falsifying a document, warned her she would be fired if caught, and also scrutinized Dillon's work product and methods. Dillon Dep. at 59. Taken in the light most favorable to Dillon, however, these conditions are not so intolerable that they would compel a reasonable employee to resign.[5] *See Haley v. Alliance Compressor LLC*, 391 F.3d 644, 652 (5th Cir. 2004) ("[H]aving one's work micromanaged may be unpleasant but does not constitute a 'greater degree of harassment than that required by a hostile environment claim.'" (citation omitted)); *Thompson v. Naphcare, Inc.*, 117 F. App'x 317, 325 (5th Cir. 2004) ("[A]n employee who resigns without affording the employer a reasonable opportunity to address her concerns has not been constructively discharged."). MDOC is therefore granted summary judgment on Dillon's constructive discharge claim.

IV.     Conclusion

The Court has considered all of the parties' arguments. Those not addressed would not have changed the outcome. For the foregoing reasons, Defendant's Motion for Summary

---

[5]Further, Dillon's own testimony suggests that it was her subjective fear of reprimand, not "badgering, harassment, or humiliation by the employer calculated to encourage . . . resignation," *Brown*, 237 F.3d at 566, that caused her to quit. *See* Dillon Dep. at 57 ("I realized that no matter what I did or how I did it, it really wasn't going to matter to Ms. Weber [sic] or Mr. Jones and I personally could not keep the stress. . . . and constantly coming in and saying what today is going to be like, what am I going to do wrong today or if I do anything wrong what's going to happen. I was constantly on edge.").

Judgment [27] is denied with respect to the discrimination claim and the retaliation claim related to the audit. It is granted as to the retaliation claim related to Dillon's Pike County assignment and her constructive-discharge claim.

    **SO ORDERED AND ADJUDGED** this the 12th day of July, 2013.

                                          s/ *Daniel P. Jordan III*
                                          UNITED STATES DISTRICT JUDGE